Jones, Chief Judge,
dissenting in part:
There is no doubt that plaintiff’s disabled condition had its inception in the service. It is probable that the malady did not become completely disabling until some years later, when it became certain from medical examinations that at that time it not only was disabling, but that the malady necessarily existed at the time of separation from the service. The nature of the malady at that time was unknown either to him or the medical examiners.
I can see no reasonable basis for denying justice to a gallant soldier, who served long under great difficulties during a period of actual hostilities, merely because the medical authorities did not discover the condition in 1945 when vast numbers of soldiers were being separated from the service, especially since the record abundantly shows that he was permanently disabled when examined and report made in June 1951. In fact the trial commissioner so found. The record leaves no doubt on this point.
I would allow retirement as of a date not later than June 1951. See dissenting opinions in Holt v. United States, 134 C. Cls. 801, 805, and MacFarlane v. United States, 134 C. Cls. 755, 760.
The trial commissioner who heard the evidence found that plaintiff was permanently incapacitated as of the date of his separation from the service in 1945. The trial commissioner saw the witnesses face to face and examined the records. Had the Army known at the time of plaintiff’s separation from the service the actual nature of his malady he would have been retired without question. The regulations set out in finding 29 clearly stipulate that a person afflicted with rheumatoid arthritis shall be ineligible for even limited service. There is not the slightest doubt as revealed by later examination that plaintiff had that malady at the time of his separation from the service.
He flew over the “Hump,” which is the highest of all mountain ranges. His assignments carried him from the hot, steamy climate of India to the cold climate of Greenland, to the hot, dry climate of Africa, and hack and forth through wide variations of climate. He had cramped rigid seating *822 space in extended flights over a period of years — 1450 hours as a navigator.
During the service he complained of pains in the thighs, legs, and mid-calf regions, which the surgeon at that time mistakenly thought were the result of cramped quarters during long hours of flight, but which later analyses showed to be a malady of a serious nature as indicated.
I would restore at least a part of the trial commissioner’s findings.
Whichever horn of the dilemma is taken, the undisputed facts of record establish plaintiff’s right to a retired status.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. On March 18,1942, at the age of 19, plaintiff enlisted as a private, Air Corps, Army of the United States. He was appointed an Aviation Cadet on May 16, 1942, a Second Lieutenant in the Army Air Corps Deserve on December 5, 1942, and a First Lieutenant in the Army of the United States on March 23, 1944. He served on active duty from March 18, 1942, to December 20,1945, when he was released to inactive duty.
2. Physical examinations conducted by the Army, prior to plaintiff’s enlistment, showed that he was physically qualified for flying duty. He performed the required training for flying without any physical difficulties. In his induction examination there is no evidence of any physical disability or ailments other than the usual childhood diseases.
3. Plaintiff was trained for and assigned to duty as a navigator and from February 1943 to October 1945, he served as a navigator of transport and bomber type aircraft in the American, European, Africa — Middle East and Asiatic Theaters of Operations. He was stationed first in Memphis, Tennessee, from which he made flights to India, Iran and other parts of the world. He was subsequently stationed in Calcutta, where he flew over the “Hump” to various parts of the Far East. In manf of the planes he flew, particularly bombers, his seating space was greatly restricted and he had *823 to sit in a cramped, rigid position for long periods of time.
He flew approximately 1,650 hours, 1,450 of which were in the performance of his duty as a navigator.
4. According to plaintiff’s testimony, in the late summer or early fall of 1943 he began to experience stiffness in his right arm and shoulder during flying and reported it to the Flight Surgeon. However, there is no medical record of such a report. None of plaintiff’s medical examinations given in May and October 1942, April 1944, and February 1945, indicated any complaint.
5. In 1944, after a trip on an A-26 plane in which the space he occupied was extremely restricted, he was so stiff that he was unable to rise out of his seat and had to be helped out. This stiffness lasted two or three days.
In August 1945, when he was stationed in Calcutta, he began to experience pains down the back of his legs and could not bend over. He reported these attacks to the Flight Surgeon, who treated him with sodium salicylates, but when the condition did not improve he was sent to a hospital.
6. On September 21, 1945, the Dispensary at Calcutta transferred him to the 142nd General Hospital with a diagnosis of “bilateral sciatic pain”. He remained at the hospital until October 5, 1945.
The hospital records show that plaintiff was admitted “with complaint of pain radiating down posterior aspects of both thighs to the mid-calf region”,; that, according to him, he had experienced pain for iyz years; that he had been seen by the Flight Surgeon and medicine administered with no beneficial results; that the attacks of pain lasted anywhere from one hour to several days, with varying degrees of intensity. The doctors told him he had a “nerve” condition down the back of his legs and he was given postural exercise, a pelvic girdle, and a board to sleep on.
An x-ray report of September 24,1945, indicated spondy-lolisthesis, L-5, having slipped forward on S-l.
He was discharged from the hospital on October 5, 1945, with a final diagnosis of “Strain, lumbo-sacral, mild, cause undetermined.”
7. After his discharge from the hospital as fit for general duty, he was returned to general duty and sent to Lincoln *824 Army Airfield, Nebraska, for separation from the service, where he was examined on October 25, 1945. The terminal physical examination showed that he had sciatic pain, starting in right sciatic notch and going down the leg along the distribution of sciatic nerve, with diagnoses of (1) Sciatica, right, moderately severe, cause probably traumatic, (2) Arthritis, sacroiliac, chronic, mild, osteoarthritis, cause unknown. These diagnoses were made following the examination which included an x-ray of the sacroiliac which was taken at the time-
8.. The two examining physicians determined that plaintiff was “qualified for general service with waiver of minor defects” found during his terminal physical examination.
9. Plaintiff was placed on terminal leave effective October 25, 1945, and released from active duty on December 20, 1945. At that time he was suffering from pain in his back, hips and legs.
During the latter part of 1945 or early 1946 plaintiff was very thin and highly nervous.
10. On April 23, 1946, the Veterans Administration rated plaintiff as of December 21,1945, the date following his discharge from service, as 20% disabled for sciatica, right, moderately severe, cause probably traumatic, and 10% for arthritis, chronic, mild, osteoarthritis, cause unknown. These ratings were obviously based upon the findings in the Air Force terminal physical examination since the wording of the diagnoses is identical and plaintiff had not been physically examined by the Veterans Administration at the time the rating was made.
11. In late December 1945, or early January 1946, plaintiff began to work in Omaha, Nebraska, but in February 1946 his knees began to give him trouble. He went to the Veterans Administration for Out-Patient treatment for his knees and back. He received medication which did not relieve him and the Veterans Administration recommended a warmer climate. A year and half later, he moved to Tampa, Florida, in August 1947, and received Out-Patient treatment from the Veterans Administration at Davis Island for a period of two months. He was given heat therapy two or three times a week by a private doctor to whom the Veterans Adminis *825 tration sent him for the condition in his knees and lower back.
The Veterans Administration records show that early in 1948 he received examinations and treatment by three doctors for pain and stiffness in both knees with clinical findings of swellings of both knees. The treatment included salicylates, diathermy and darthronol. The clinical diagnosis was arthritis, hips and knees.
12. The Veterans Administration report of physical examination of February 26, 1948, shows that plaintiff complained of arthritis, swelling and aching of both knees; that a clinical diagnosis of “rheumatic arthritis” was made; that an x-ray of the sacrolumbar spine showed a slight spondy-lolisthesis, a slight sclerosis of the articulations between the 4th and 5th lumbar vertebrae and moderately advanced sclerosis of both sacroiliac articulations; that an orthopedic doctor diagnosed his ailment as hydro-arthrosis, right knee, cause undetermined; spondylolisthesis, mild; arthritis, sacroiliac joints, mild. At this time his Veterans Administration disability rating was reduced to 10%.
13. In October 1948, he went to Washington, D.C., to see his brother. In Washington a retired officer informed him that he was entitled to retirement. On October 21, 1948, plaintiff wrote to the United States Air Force, requesting consideration of his claim for retirement, stating:
Upon discharge from active duty at Lincoln Army Air Field, Lincoln, Nebraska I was informed by the O.O. of the medical department of the discharge center that my physical condition was bad enough for retirement except that he had orders from Washington to let the reserves go through as they were. _ Since then I have found out that the reserves are entitled to the same retirement as the regular army.
14. On November 23, 1948, the Director of Military Personnel, Department of the Air Force, advised plaintiff that his record had been carefully reviewed and did not indicate a permanent incapacitating defect while on active duty.
15. After his visit to Washington, plaintiff moved to Houston in 1948. At that time.he had difficulty standing on his legs. On April 19, 1949, he was examined by the Veterans Administration in Houston, Texas. As a result of a *826 neuropsychiatric examination, he was found to have sciatic neuritis, right, mild, due to Piriformis Muscle Syndrome. The doctor stated: “It might be advisable to have the Piri-formis Muscle severed surgically. The individual is nervous and that complicates the picture somewhat. He may also have some arthritis.” A further diagnosis of hydro-arthrosis, right knee, mild, was made. An x-ray report shows a normal spine and right knee.
16. In 1950 the plaintiff was examined to ascertain whether he was physically qualified for service in the Korean conflict. He was sent to Brooks Air Force Base where, on September 9, 1950, after x-rays were taken of his knees and back, he was found disqualified by reason of “marked hydro-arthrosis, both knee joints. Sub Patella Crepitus. Patella bilaterally floats beyond joints . . . arthritic knees”. On September 12, 1950, plaintiff was released from active duty “having been found physically disqualified”.
17. By reason of his disability, plaintiff was, on November 11, 1950, transferred to the United States Air Force Honorary Reserve in accordance with AR 140-120, 20 February 1950. Section V of said Regulation entitled “Transfer of Individual between Active Reserve, Inactive Reserve and Honorary Reserve” provides as follows:
13. Physical Requirements — To meet the physical requirements for retention in the Active Reserve an individual must be physically qualified for general military service or general military service with waiver for minor defects which would not preclude the performance of general military duty.
14. Permanently Physically Disqualified Reservists — An individual found to be permanently physically disqualified for military duty will either be transferred to the Honorary Reserve, if eligible therefor, or will be discharged from the Reserve by the Area Commander.
15. Remedial Physical Defects — Individuals found to be temporarily disqualified for Active Reserve because of physical defects which are considered to be remediable within one year, will be transferred to the Inactive Reserve.
18. On February 21, 1951, plaintiff consulted Dr. Jesse W. Hofer of Houston, a specialist in internal medicine, diagnosis and treatment. Following x-ray of the knees and *827 physical examination, the doctor found a fusion and swelling of synovia of both knees, more marked on the right. He treated the plaintiff with cortisone for a period of three weeks and with gold therapy relief. Dr. Hofer has continued to treat the plaintiff since that first visit.
19. On August 16,1951, the Veterans Administration examined plaintiff. The x-ray diagnoses were; Spondylolis-thesis, L-5; rheumatoid arthritis, lumbar spine and both sacroiliac joints, Marie Strumpell type (some narrowing of the apophyseal joints of the lumbar spine, with sclerosis and irregularity and partial obliteration of the sacroiliac joints) ; minimal hypertrophic changes medial condyles, both knees; joint effusion, right knee. The diagnoses were:
(1) Lumbosacral Area: Arthritis rheumatoid, mild, developmental anomaly.
(2) Left Knee: Arthritis, rheumatoid., at present mild.
(3) Eight Knee: Arthritis, rheumatoid with increased joint fluid and limitation of motion. Moderately severe.
Marie Strumpell type arthritis is the kind of arthritis that involves the sacroiliac articulation. X-rays taken by Dr. Hofer in September 1951 showed rheumatoid arthritis of the lumbar spine in both sacroiliac joints, Marie Strumpell type. After this examination, plaintiff’s Veterans Administration disability rating was increased to 40%.
20. Plaintiff again asked the Air Force for reconsideration and received a reply dated February 14, 1952, to the effect that under the Comptroller General’s Opinion of April 25, 1951, plaintiff could not be considered for disability retirement pay and that the Department ox Defense had submitted remedial legislation to Congress with reference to such cases.
21. On October 30,1952, the Air Force in a letter to plaintiff called his attention to the statute and regulation authorizing the Air Force Board for the Correction of Military Eecords to take jurisdiction where necessary to correct an error and remove injustice and enclosed a blank form of application to such Board. On December 11, 1952, plaintiff filed the application, attaching thereto the sworn statement of Dr. Hofer dated December 2,1952, addressed to the Secretary of the Air Force. On March 27, 1953, plaintiff sent *828 the Air Force a supplementary statement of Dr. Hofer dated March 24,1953. In the supplementary statement, Dr. Hofer said that plaintiff’s rheumatoid arthritis was progressing with complaints of recurrent pain in neck, mid-back, right elbow, right shoulder, both feet and calf muscles; with moderately severe atrophy of the extensor muscles above the knees; and with a proliferative type of arthritic change in each sacroiliac articulation.
22. On September 17, 1953, the Correction Board notified plaintiff there was not sufficient basis for a hearing and plaintiff was never accorded a hearing.
23. It is stated in “Comroe’s Arthritis”, 5th Edition, 1953, a standard text on the subject of arthritis, that:
Spondylitis, in the broad sense, means arthritis of the spine.
[spondylitis] “is merely the spinal variant of rheumatoid arthritis ... a general systemic process in which the predominant manifestations occur in the spinal joints and their related structures.”
Because the real diagnosis is often overlooked for years the clinical features which characterize the onset are of considerable importance. The early symptoms of rheumatoid spondylitis are quite frequently mislabelled as muscular rheumatism, fibrositis, lumbago, chronic low back strain, idiopathic sciatica or even kidney disease. The onset is insidious in approximately 80 per cent of cases. Almost invariably the first complaints are referred to the lower back and consist of episodes of aching and stiffness, transient back pains or sciatica.
Involvement of sacro-iliac joints is a more important part of rheumatoid arthritis. In the vast majority of instances, but not in all, these joints are the first to be affected. Usually the first symptoms are referable to the lower back, and certainly the earliest.
* * * Months or years may elapse before clinical manifestations or x-ray alterations appear higher in the spine. The x-ray findings in rheumatoid spondylitis are quite characteristic. In general they reflect those pathologic changes which occur in the sacro-iliac and apophyseal articulations and in the paraspinal ligaments.
The cause of rheumatoid arthritis remains unknown.
24. In “Rheumatoid Arthritis” 1957, written by Charles L. Short, President of American Rheumatism Association, 1955-56, Walter Bauer, Professer of Clinical Medicine at *829 Harvard, and William E. Reynolds, Supervisor of Public Health, at University of Washington, it is stated that some of the precipitating factors of rheumatoid arthritis are: Exposure to cold or dampness, trauma, strain, unusual strains to back. On page 166 of this work it is stated:
Strain was found to be the most common precipitating factor, with over one-fourth of the patients admitting to a period of unusual anxiety, extended physical exertion, or both, associated with the onset of arthritis. Although an attempt might be made to divide, these patients, according to whether the strain experienced was mental or physical, it seems likely in most cases that both types had been present. For example, work demanding long hours or of a fatiguing nature was usually accompanied by anxiety and tension.
25. The following Army Regulations were in effect at the times indicated:
(1) AR 40-105, 14 October 1942, superseded by AR 40-105,29 October 1946, entitled “Medical Department — Standards of Physical Examination for Commission in Regular Army, National Guard of the United States, Army of the United States and Organized Reserves”, provided:
(a) Sec. XVI. Spine and Pelvis, including Sacroiliac and Lumbo-sacral Joints.
Par. 47. Conditions which are Cause for Rejection: (c) Spondylolisthesis.
(f) Osteoarthritis of spinal column.
(h) Disease of sacro-iliac or lumbo-sacral joints.
Sec. XVII. Entremities.
Par. 49. Conditions which are Cause for Rejection:
(i) Diseases of bones and joints.
Sec. IV. General Examinations * * *
Par. 20. Conditions which are Cause for Rejection: g (5) * * * atrophic or hypertrophic arthritis.
(2) AR 40-100, 8 April 1946, superseded by AR 40-100, 3 January, 1951, entitled “Medical Department — Miscellaneous Physical Examinations’1"1, provided:
Par. 7a. “* * * i. In periods of national emergencies individuals may be accepted for original appointment or extended active duty who do not meet the physical standards for general military service but who are physically qualified for limited military service.”
*830 Par. 7b. “The following conditions are listed as an aid to uniformity in determining the physical qualifications of officers and current officers for original appointment or extended active duty in a limited service status.
(2)Non-acceptable for limited service * * *
i. Osteoarthritis, rheumatoid arthritis or acute or chronic arthritis from any cause.
(3) AR 40-1025,12 December 1944, entitled “Medical Deportment — Records and Reports of Sick and Wounded”, provided:
Par. 63g (4). “* * * advancement of such conditions as peptic ulcer, rheumatoid arthritis, diabetes mellitus, active pulmonary tuberculosis, and bronchial asthma (not established as seasonal) can be expected to have been caused by exertion, exposure or other adverse influence of the military service.”
(4) AR 140-5, 7 June 1941, superseded by AR 140-5, 27 October, 1949, entitled “Officer Reserve Corps” provided:
Par. _ 10. “Physical Examinations. Except where otherwise specifically provided, every applicant for appointment in the Officers Reserve Corps and every Reserve officer qualifying for reappointment, retention, promotion, transfer or active duty, as well as extensions of tours thereof, and upon relief from active duty, will be required to pass satisfactorily a physical examination of the scope prescribed by current War Department instructions.
The physical standards will be those prescribed in AR 40-100 and 40-105 * * * supplemented by current War Department instructions.”
(5) AR 605-10, 26 May 1944, superseded by AR 605-10, 9 March 1946, entitled “Commissioned Officers — Officers Appointed in the Army of the United States”, provided:
Par. 20. “Physical Standards. The physical standards for appointment and promotion, for retention of commission, and for entry upon active duty of an officer appointed in the Army of the United States under these regulations are those prescribed for the Officers Reserve Corps in AR 40-100, 40-105 and, where applicable, 40-110, all as supplemented or modified by current War Department instructions.”
Par. 22 “Waiver of Physical Defects. Deviations from normal physical standards that will not interfere with nor prevent the full and satisfactory performance *831 of the duty for which the individual is appointed, or is being ordered to active duty, and that are not of a nature likely to be aggravated to a disabling degree by active military service, may be waived in the manner and under the conditions authorized in current War Department instructions.”
(6) Tentative War Department Technical Manual TM 12-245, 1 October, 1945, entitled “Physical Reclassification, Retirement and Retirement Benefits for Officers''', provided:
“1. Applicability, a. Classification of officers for general or limited service, and hospitalization and disposition (including determination of eligibility for retirement benefits, in appropriate cases) of officers determined to be physically unfit for general service or for limited service will be governed by these instructions. * * *
2. Limited service status, a. Physical standards for commission and appointment of officers, warrant officers and flight officers for active (general) military service are set forth in Alt 40-105 and 40-100, respectively.
b. Due regard will be given to the provisions of the above-mentioned regulations in considering the physical qualifications of officers for retention on active (general) service. However, in this connection, the mentioned regulations will not be as strictly interpreted as for appointment or entrance on active duty.
c. Thus, officers may be found capable of performing active (general) service even though they have diseases, injuries, or infirmities which would disqualify them for original appointment, provided such diseases, injuries or infirmities are of such a nature and degree as not to affect adversely the performance of active (general) service (including oversea duty) considering the individual’s age, grade, branch and MOS.”
(The foregoing provisions are the same as contained in Paragraphs 2 a, b, c of War Department Circular No. 313, 12 October 1945, effective until 12 April 1947, entitled “Physical Declassification of Officers”.)
26. On September 10,1945, a new War Department Technical Manual TM 8-255, entitled “Terminal Physical Examination on Separation from Military Service”, was promulgated. The purpose of this Manual was to establish the standards and procedures to be followed in terminal physical examinations prior to separation and release from active duty. The instructions in the Manual applied to all instal *832 lations at which military personnel were processed for separation from active military service.
The Manual in Par. 10c(4) provided:
AE 40-100, AE 40-105, and ME 1-9 in effect will serve as a guide only in determining incapacitation for military service. Medical judgment will be followed in determining whether any defect is likely to interfere with satisfactory performance of work in civilian life. Procedure for separation of enlisted personnel on Certificate of Disability for Discharge will be in accordance with current regulations.
TM 8-255, 10 September 1945, was inconsistent with TM 12-245, 1 October 1945, entitled “Physical Eeclassification, Eetirement and Eetirement Benefits for Officers”. This manual provided that what constituted “permanent incapacity for active service” for Eegular Army officers likewise constitutes “disability” for non-Eegular officers, and in defining what constitutes incapacity for Eegular officers, entitling them to retirement, the Manual provided:
An officer is incapacitated for active service when he is permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent his retirement under section 1251, Eevised Statutes, supra, by reason of being permanently incapacitated for active service.
The Act of April 3, 1939, 53 Stat. 557, 10 IT. S. C. 456, provided that non-Eegular Army officers “shall be in all respects entitled to receive the same retirement pay * * * as are now or may hereafter be provided by law and regulation for officers * * * of corresponding grades and length of service of the Eegular Army.”
Executive Order 8461, June 28,1940, amending Executive Order 8099, April 28, 1939, which provided that payments under the Act of April 3,1939, were to be made by the Veterans Administration, but the determination of eligibility by the Secretary of "War, contained this further provision:
The determination of all questions of eligibility for the benefits thereof, including all questions of law and fact relating to such eligibility, shall be made by the Secretary of War, or by someone designated by him in *833 the War Department, in the manner provided by law and regulation for Regular Army personnel.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and>his petition is therefore dismissed.